**Electronically Filed
Intermediate Court of Appeals
28248
23-NOV-2011
07:47 AM**

NO. 28248

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


LAWRENCE O'GOREK, BEATRICE TSUNEYOSHI, KIM KALANI,
and the HAWAII GOVERNMENT EMPLOYEES ASSOCIATION (HGEA),
Plaintiffs-Appellants, Cross-Appellees,
v.
HAWAII PUBLIC EMPLOYEES HEALTH FUND; BOARD OF TRUSTEES OF THE
HAWAII PUBLIC EMPLOYEES HEALTH FUND; GREGORY SATO, ROBERT HU,
JULIE PRICE, STEVETTE SANTIAGO, TRACY CHANG, MILTON FUKE, DOLORES
FOLEY, REV. BRUCE NAKAMURA and GEORGINA KAWAMURA, In their
official capacity as Trustees of the Hawaii Public Employees
Health Fund and not Individually; DIRECTOR OF FINANCE OF THE
STATE OF HAWAIʻI; and the STATE OF HAWAIʻI, Defendants-Appellees,
Cross-Appellants.


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 03-1-1352)


MEMORANDUM OPINION
(By: Nakamura, C.J., Leonard, J., and Circuit Judge Toʻotoʻo in
place of Foley, Fujise, Reifurth, and Ginoza, JJ., all recused)

This class action litigation involves a plaintiff class
(Class) generally comprised of all active employees who
participated in, and were beneficiaries of, health benefits plans
of the Hawaii Public Employees Health Fund (Health Fund) from its
inception in 1961 until its termination on June 30, 2003. The
Hawaiʻi Legislature established the Health Fund "for the purpose
of providing employee-beneficiaries and dependent-beneficiaries
with a health benefits plan[.]" Revised Laws of Hawaiʻi (RLH) §
5A-3 (Supp. 1961); 1961 Haw. Sess. Laws Act 146 (hereinafter,
"Act 146"), § 1 at 192. The most significant health plan at
issue in this appeal, was the plan administered by the Hawaii

Medical Service Association (HMSA). During the times relevant to this appeal, government employers generally contributed 60 percent and the employee contributed 40 percent of the monthly premiums paid to HMSA through the Health Fund. The premiums paid to HMSA were based on an estimate of the actual costs of providing health benefits for the plan year, and a reconciliation of the premiums paid with the actual costs incurred was conducted after the close of the plan year.

For several years beginning in 1992, the premiums paid exceeded the actual costs, resulting in premium overpayments or surpluses which were returned to the Health Fund. By 1998, the Health Fund had accumulated a large surplus in premium overpayments to HMSA and other health insurance carriers. Prior to 1998, the Legislature had made numerous statutory amendments to the Health Fund statute,[1] which expanded the purposes for which the premium surpluses could be used. In 1998, facing difficult economic conditions, the Legislature passed Act 141, which required the Health Fund to return approximately $43 million of the accumulated surplus, "representing the State's share . . . and . . . the counties' share of insurance carrier refunds, rate credits, and any interest accrued thereon," to the appropriate State and county general funds. 1998 Haw. Sess. Laws Act 141 (hereinafter, "Act 141"), § 15 at 524.

Plaintiffs-Appellants/Cross-Appellees Lawrence O'Gorek, Beatrice Tsuneyoshi, and Kim Kalani (Class Representatives), on behalf of themselves and the Class, and the Hawaii Government Employees Association (HGEA) (collectively, "Plaintiffs") filed suit to recover damages arising out of the alleged misuse of the premium surpluses, including amounts the Legislature through Act 141 had mandated that the Health Fund return to State and county employers. Plaintiffs claim that the Health Fund statute created contractual obligations that were breached and vested property

---

[1] The Health Fund statute was initially codified in 1961 as RLH Chapter 5A and later recodified as Hawaii Revised Statutes (HRS) Chapter 87.

2

rights that were unconstitutionally taken by the Legislature's mandating the return of a portion of the premium surpluses to the government employers. Plaintiffs also claim that the Trustees of the Health Fund breached their fiduciary duties in operating the Health Fund, particularly with respect to their decisions on how to use the premium surpluses, and engaged in misrepresentation in describing the health plans.

Defendants-Appellees/Cross-Appellants the Health Fund; the Board of Trustees of the Health Fund (Board); Gregory Sato, Robert Hu, Julie Price, Stevette Santiago, Tracy Chang, Milton Fuke, Dolores Foley, Rev. Bruce Nakamura, and Georgina Kawamura, in their official capacities as Trustees of the Health Fund and not individually (Trustees); the Director of Finance of the State of Hawai'i (Director of Finance); and the State of Hawai'i (State) (collectively, "Defendants") filed a series of motions for summary judgment and partial summary judgment. Plaintiffs filed a counter motion for partial summary judgment. The Circuit Court of the First Circuit (Circuit Court)[2] granted summary judgment in favor of Defendants and entered judgment against Plaintiffs on all claims raised in Plaintiffs' complaint, but it denied Defendants' partial summary judgment motion based on the statute of limitations and laches. The Circuit Court denied Plaintiffs' counter motion for partial summary judgment.

On appeal, Plaintiffs argue that the Circuit Court erred in granting summary judgment in favor of Defendants. Defendants cross-appeal, claiming that the Circuit Court erred in denying their motion seeking partial summary judgment on the additional grounds of statute of limitations and laches.

As set forth in greater detail below, we affirm the Circuit Court's grant of summary judgment in favor of Defendants. We conclude that Plaintiffs' claim that the Health Fund statute created contractual obligations that were breached and vested property rights that were unconstitutionally taken is without

_____

[2] The Honorable Gary W.B. Chang presided.

3

merit.  We further conclude that Defendants were entitled to summary judgment on Plaintiffs' claims that the Trustees breached their fiduciary duties and engaged in misrepresentation.  In light of our disposition of Plaintiffs' appeal, we find it unnecessary to address Defendants' cross-appeal.

BACKGROUND

I.

In 1961, the Legislature created the Health Fund for the purpose of providing government employees and their dependents with a health benefits plan.  RLH § 5A-3 (Supp. 1961); 1961 Haw. Sess. Laws Act 146, § 1 at 192.  The original Health Fund statute established a Board of Trustees to administer and carry out the purpose of the Health Fund.  RLH § 5A-12 (Supp. 1961); 1961 Haw. Sess. Laws Act 146, § 1 at 194.  The original statute provided that the Board shall consist of nine trustees, three from different organizations representing public employees, three from different private business organizations, a member of the clergy, a teacher, and the director of the budget.  RLH § 5A-6, 1961 Haw. Sess. Laws Act 146, § 1 at 193.  The Trustees were to serve without compensation.  RLH § 5A-10 (Supp. 1961); 1961 Haw. Sess. Laws Act 146, § 1 at 193.  The Board's duties included determining the health services to be provided by the health benefit plans, entering into contracts for health benefit plans, selecting the carrier to provide indemnity type health benefit plans, and establishing eligibility requirements for employees and their dependents.  RLH §§ 5A-13 to -15 (Supp. 1961);  1961 Haw. Sess. Laws Act 146, § 1 at 194.  The Health Fund was terminated on June 30, 2003, by the repeal of HRS Chapter 87, and the Health Fund was replaced by the Hawaii Employer-Union Health Benefits Trust Fund (EUTF).  2001 Haw. Sess. Laws Act 88, §§ 1-10 at 138-52; HRS Chapter 87A.

A.

During the life of the Health Fund, a variety of plans were established, including medical, dental, prescription drug, vision, and life insurance plans.  These plans were funded by the

Health Fund which was defined by statute to consist of "contributions, interest, income, dividends, refunds, rate credits and other returns." HRS § 87-2 (1993).

Public employers and active employees desiring health benefits were required to contribute to the Health Fund. Prior to 1985, the Legislature established the public employer's contribution as a specific dollar amount set forth in the statute. See, e.g., HRS § 87-4 (1976). Effective July 1, 1985, the Legislature amended the Health Fund statute to require the public employer to contribute amounts in accordance with "the applicable public sector collective bargaining agreement" or as established under HRS Chapter 89C.[3] 1984 Haw. Sess. Laws Act 254, §§ 4, 9 at 570-71, 573; HRS § 87-4(a) (Supp. 1984 & 1993). Throughout the existence of the Health Fund, the Health Fund statute provided that employer contributions to the Health Fund "shall not be considered as wages or salary of an [employee-beneficiary,] and no [employee-beneficiary] shall have any vested right in or be entitled to receive any part of any contribution made to the [Health Fund]." RLH § 5A-4 (Supp. 1961); HRS § 87-4(f) (1993).

By far the most significant health plan at issue in this case was the medical plan administered by HMSA. During the period relevant to this case, the collective bargaining agreements generally required the employer to pay 60 percent of the monthly premium for the HMSA medical plan.

The Health Fund negotiated medical plans with HMSA that were "experience-rated," which means that they provided for a refund of premiums based on claims experience.[4] If the premiums paid during a given plan year exceeded the actual claims paid

---

[3] Amounts established under HRS Chapter 89C pertain to contributions for public officers and employees who are excluded from collective bargaining. Contributions for excluded employees under the same classification systems as bargaining unit employees may not be less than those for bargaining unit employees "hired on a comparable basis." See HRS § 89C-2(4) (Supp. 2002).

[4] Other health plans negotiated by the Health Fund, such as the dental plan with Hawaii Dental Service and vision plan with Vision Service Plan, were also experience-rated.

plus the amount of HMSA's fee, the surplus would be refunded to the Health Fund pursuant to the contract between the Health Fund and HMSA.  If the premiums paid were less than the actual claims paid plus HMSA's fee, HMSA would be responsible for covering the deficiency.[5/]  The premiums for a given plan year were negotiated and established well before the premiums were paid and the actual health costs were incurred.[6/]  The determination of whether there was a surplus or deficiency in the premiums paid was not made until several months after the end of the plan year.

Between 1992 and 1996, the Health Fund accumulated a substantial surplus in the premiums paid for the HMSA medical plan.  According to Defendants, total medical plan premiums paid to HMSA by employers and employees and the resulting surplus and deficit for plan years 1992 to 2003 (a plan year ends on June 30) were as follows:

| Year | Premiums | Surplus/(Deficit) | Percent of total premiums |
|------|----------|-------------------|---------------------------|
| 1992 | $66,094,041 | $5,323,304 | 8% |
| 1993 | 76,609,543 | 11,891,444 | 15.5% |
| 1994 | 87,583,374 | 13,760,267 | 15.7% |
| 1995 | 77,578,821 | 4,782,428 | 6.2% |
| 1996 | 53,160,640 | 1,735,854 | 3.2% |
| 1997 | 48,360,980 | (1,806,652) | (3.7)% |
| 1998 | 47,592,166 | 3,528,694 | 7.4% |
| 1999 | 42,005,209 | 1,362,900 | 3.2% |
| 2000 | 40,315,335 | (2,746,283) | (6.8)% |
| 2001 | 42,318,266 | 1,030,619 | 2.4% |
| 2002 | 47,985,983 | 2,026,472 | 4.2% |
| 2003 | 49,441,553 | 1,598,066 | 3.2% |
| Totals | $679,045,911 | $42,487,113 | 6.25% |

Defendants' information reflects that between 1992 and 2003, a total of $679,045,911 in medical plan premiums were paid

---

[5/] As discussed below, the Health Fund and HMSA agreed to the creation of a stabilization reserve that allowed HMSA to offset certain premium deficiencies with premium surpluses.

[6/] For example, the Health Fund distributed bid specifications to interested carriers in October 1994 for premiums effective for the July 1995 to June 1996 plan year.

to HMSA, which resulted in premium surpluses totaling $42,487,133. This surplus, while large in dollar amount, was only approximately 6 percent of the total premiums paid. The lion's share of the premium surpluses returned to the Health Fund were from the HMSA medical plan. It is the use of the premium surpluses returned to the Health Fund by HMSA and other health insurance carriers from and after the 1992 plan year, and the interest earned on those surpluses, that is contested in this case.

B.

From the Health Fund's inception, the premium surpluses or "rate credits" were part of the Health Fund. HRS § 87-3 and its predecessor, RLH § 5A-3, set forth the permissible uses of the Health Fund. Throughout the history of the Health Fund, the Legislature made numerous changes to the permissible uses of the premium surpluses and the income derived from the surpluses.

1. When the Health Fund was created in 1961, RLH § 5A-3 (Supp. 1961) provided that "[t]he [Health Fund] shall be used solely for the purpose of providing employee-beneficiaries and dependent-beneficiaries with a health benefits plan, provided that the [Health Fund] may be used for other expenses necessary to effectuate such purpose."

2. In 1965, the Legislature expanded the permissible uses of the Health Fund by amending RLH § 5A-3 to provide that "any rate credit or reimbursement from any carrier or any earning or interest derived therefrom" shall be used for the additional purposes of financing (1) the State's contribution for the dental benefits plan for children and (2) the employees' portion of the contribution for a health benefit plan for retired employees. RLH § 5A-3 (Supp. 1965); 1965 Haw. Sess. Laws Act 235, § 1(G) at 391.

3. In 1978, the Legislature amended HRS § 87-3 to also permit rate credits or reimbursements and their earnings to be used to finance county contributions for the children's dental

benefits plan. HRS § 87-3 (Supp. 1978); 1978 Haw. Sess. Laws Act 18, § 1 at 26.

4. In 1991, the Legislature amended HRS § 87-3 to further permit rate credits or reimbursements and their earnings to be used (1) to finance the State and county employers' and the employee's contributions for health benefit plans from which such moneys were derived and (2) to improve the benefits of the plans from which such moneys were derived. HRS § 87-3 (Supp. 1991); 1991 Haw. Sess. Laws Act 331, § 3 at 1036.[7] Thus, prior to the accumulation of the premium surpluses at issue in this case, the Legislature had amended HRS § 87-3 to authorize the use of the premium surpluses and earning thereon to finance the *employers'* contributions for health plans from which the surpluses and their earnings were derived.[8]

5. In 1995, the Legislature amended HRS § 87-3(a) to provide that rate credits or reimbursements or their earnings "shall be returned to the State or county for deposit into the

---

[7] After the 1991 amendment, HRS § 87-3(a) (Supp. 1991) provided as follows:

§ 87-3 **Purpose of the fund.** (a) The [Health Fund] shall be used for the purpose of providing employee-beneficiaries and dependent-beneficiaries with a health benefits plan and a long-term care benefits plan; provided that the [Health Fund] may be used for other expenses necessary to effectuate these purposes; and provided further that any rate credit or reimbursement from any carrier or self-insured plan or any earning or interest derived therefrom shall be used in addition to such purposes to:

    (1)    <u>Finance the employee's and state and county contributions for the respective benefit plan from which such moneys are derived</u>; and

    (2)    Improve the benefits of the respective plan from which such moneys are derived.

(Emphasis added.)

[8] The legislative history of the 1991 amendment indicates that HRS § 87-3 was amended "to require the use of excess funds in the plan to lower contributions or increase benefits[.]" S. Stand. Comm. Rep. No. 375, in 1991 Senate Journal, at 913. The quoted Committee Report pertains to S.B. 1538, S.D. 1, which the Senate used to replace the entire contents of the House bill that was eventually enacted. <u>See</u> S. Stand. Comm. Rep. No. 908, in 1991 Senate Journal at 1074. The quoted Committee Report refers to "Section 87-2," but it is clear that the report intended to refer to "87-3" since the bill amended HRS § 87-3, and not HRS § 87-2.

appropriate general fund" if the moneys were derived from retiree and surviving spouse health plans. HRS § 87-3(a) (Supp. 1995); 1995 Haw. Sess. Laws Act 183 (hereinafter, "Act 183"), § 1 at 349. Act 183 deleted the language added by the 1991 amendments to HRS § 87-3(a). Act 183 also provided that "[t]his Act shall have retroactive application to any rate credit, refund, or reimbursement made to the [Health Fund] prior to the effective date of this Act[,]" with the effective date being June 14, 1995. 1995 Haw. Sess. Laws Act 183, §§ 2, 4 at 349.

6. In 1996, the Legislature amended HRS § 87-3(a) to provide that rate credits or reimbursements or their earnings "shall be returned to the State or county for deposit into the appropriate general fund." HRS § 87-3(a) (Supp. 1996); 1996 Haw. Sess. Laws Act 269, § 1 at 635-36. The 1996 amendment to HRS § 87-3(a) removed the limitation contained in the 1995 amendment that the moneys be derived from retiree and surviving spouse health plans. 1996 Haw. Sess. Laws Act 269, § 1 at 635-36. A Senate Committee Report accompanying the 1996 amendment stated that the purpose of the amendment was to

> ensure that rate credits and reimbursements identified by insurers are returned to the State and counties so that:
>
> (1) The State and counties may make use of the moneys as necessary, given the current fiscal crisis; and
>
> (2) To eliminate any possibility that the application of rate credits or reimbursements to future costs of the [Health Fund] would mask any increase in actual costs.

S. Stand. Comm. Rep. No. 2431, in 1996 Senate Journal, at 1148-49.

7. In 1997, the Legislature amended HRS § 87-3(a) so that it provided as follows:

> § 87-3 **Purpose of the fund.** (a) The [Health Fund] shall be used for the purpose of providing employee-beneficiaries and dependent-beneficiaries with a health benefits plan and a long-term care benefits plan; provided that the [Health Fund], including rate credits or reimbursements from any carrier or self-insured plan or any earning or interest derived therefrom, may be used to stabilize health benefits plan or long-term care benefits plan rates and with approval of the legislature through

appropriation of funds for other expenses necessary to effectuate these purposes. <u>Notwithstanding any law to the contrary, any rate credit or reimbursement from any carrier or self-insured plan in excess of funds used to stabilize health benefits plan or long-term care benefits plan costs, and for other expenses authorized by the legislature or any earning or interest derived therefrom shall be returned to the State or the county for deposit into the appropriate general fund if the moneys are returned from:</u>

    (1)    A plan that provides health benefits to retirees or the surviving spouses of deceased retirees or employees killed in the performance of their duty whose coverage is financed in whole or in part by the State or by the county; or

    (2)    <u>A plan that provides health benefits to employees; provided that the amount returned to the general fund shall be only that portion financed by the State or by the county on behalf of the employee</u>.

HRS § 87-3(a) (Supp. 1997) (emphases added); 1997 Haw. Sess. Laws Act 276, § 1 at 609-10.

    8.    In 1998, the Legislature enacted Act 141 which mandated that:

Upon the effective date of this Act, the [Health Fund] shall return the sum of $31,315,640, representing the State's share of insurance carrier refunds, rate credits, and any interest accrued thereon, to the state general fund, and $12,057,821, representing the counties' share of insurance carrier refunds, rate credits, and any interest accrued thereon, to the appropriate county general fund.

1998 Haw. Sess. Laws Act 141, § 15 at 524. This provision of Act 141 took effect on July 1, 1998.

    9.    In 2001, the Legislature amended HRS § 87-3(a) to authorize the Health Fund to return rate credits or reimbursements or their earnings, which were derived from employee-beneficiary contributions and were in excess of funds used to stabilize benefit plan costs, to employee-beneficiaries. HRS § 87-3(a) (Supp. 2001); 2001 Haw. Sess. Laws Act 147 (hereinafter, "Act 147"), § 1 at 358-59.[2/] Act 147 authorized

---

[2/] After the 2001 amendments, HRS § 87-3(a) provided:

**§ 87-3 Purpose of the fund.** (a) The [Health Fund] shall be used for the purpose of providing employee-beneficiaries and dependent-beneficiaries with a health benefits plan and a long-term care benefits plan; provided that the [Health Fund], including rate credits or reimbursements from any carrier or self-insured plan or any earning or interest derived therefrom,

(continued...)

the Health Fund to return such rate credits or reimbursements or
their earnings to employee-beneficiaries who created the rate
credits or reimbursements or to other employee-beneficiaries, or
to use these funds to reduce the employee-beneficiary's share of
premiums.  HRS § 87-3(a) (Supp. 2001); 2001 Haw. Sess. Laws Act
147, § 1 at 358-59.  A House Committee Report accompanying Act
147 stated that the purpose of the 2001 amendments was "to allow
the [Health Fund] to return to beneficiaries, the employee's
share of insurance carrier refunds based on the employee's years

---

[9]/(...continued)
may be used to stabilize health benefits plan or long-term care
benefits plan rates, and with approval of the legislature through
appropriation of funds for other expenses necessary to effectuate
these purposes.  Notwithstanding any law to the contrary, any rate
credit or reimbursement from any carrier or self-insured plan in
excess of funds used to stabilize health benefits plan or
long-term care benefits plan costs, and for other expenses
authorized by the legislature or any earning or interest derived
therefrom:

> (1)  Shall be returned to the State or the county for
> deposit into the appropriate general fund if the
> moneys are returned from:
>
> > (A)  A plan that provides health benefits to retirees
> > or the surviving spouses of deceased retirees or
> > employees killed in the performance of their
> > duty whose coverage is financed in whole or in
> > part by the State or by the county; or
> >
> > (B)  A plan that provides health benefits to
> > employees; provided that the amount returned to
> > the general fund shall be only that portion
> > financed by the State or by the county on behalf
> > of the employee; and
>
> (2)  As authorized by the board, may be:
>
> > (A)  Returned to identifiable employee-beneficiaries
> > who participated in ascertainable years to
> > create the rate credit or reimbursement or to
> > any other employee-beneficiaries; or
> >
> > (B)  Used to reduce the employee-beneficiary's
> > respective share of monthly contributions to a
> > health benefits plan;
> >
> > provided that the amount was derived from
> > employee-beneficiary rate contributions to health
> > benefit plans of employee-beneficiaries who are not
> > participating in a health benefits plan of an employee
> > organization, or interest derived therefrom.

(Emphases added.)

11

of benefit plan participation." H. Stand. Comm. Rep. No. 1255, in 2001 House Journal, at 1607; see S. Stand. Comm. Rep. No. 489, in 2001 Senate Journal, at 1133. A Senate Committee Report accompanying Act 147 further stated:

> Your Committee finds that during 1992-1996, the [Health Fund] received $60 million in refunds from insurance carriers. In 1998, the Legislature enacted Act 141, Session Laws of Hawaii 1998, which required the Health Fund to return $43 million to the State and counties as the employers' share of the insurance carrier refunds. The remainder, with interest, totals $24 million and represents the approximate total amount payable to state and county employees who were members of the Health Fund during that period in time.

S. Stand. Comm. Rep. No. 489, in 2001 Senate Journal, at 1133-34. The 2001 amendments to HRS § 87-3(a) left intact the 1997 amendments which provided that the Health Fund shall return to State and county employers the employer-financed portion of rate credits or reimbursements and their earnings that were in excess of funds used to stabilize benefit plan costs.

In addition to repeatedly amending HRS § 87-3 and its predecessor, RLH § 5A-3, the Legislature also enacted and amended HRS § 87-22.3, a provision relating to the Board's determination of health benefit plans.

1.    In 1984, the Legislature added a new section to the Health Fund statute that became HRS § 87-22.3. HRS § 87-22.3 (Supp. 1984); 1984 Haw. Sess. Laws Act 71, § 1 at 123-24. The new section distinguished between health benefits plans offered by the Health Fund and those offered by employee organizations (unions). It provided in relevant part that pursuant to HRS § 87-4 (regarding State and county contributions to the Health Fund), "[a]ny rate credit or reimbursement from any carrier of any earnings or interest derived from [Health Fund plans] . . . shall be used to improve the respective [Health Fund plans] or to reduce the employee-beneficiary's respective share of monthly contributions to a health plan." HRS § 87-22.3 (Supp. 1984) (emphases added); 1984 Haw. Sess. Laws Act 71, § 1 at 123.

2.    In 1997, the Legislature amended HRS § 87-22.3 to provide in relevant part that "[a]ny rate credit or reimbursement

<u>from any carrier derived from employee-beneficiary rate
contributions to [Health Fund plans] or interest</u> derived
therefrom <u>may be used</u> to improve the respective [Health Fund
plans] or to reduce the employee-beneficiary's respective share
of monthly contributions to a health plan[.]"  HRS § 87-22.3
(Supp. 1997) (emphases added); 1997 Haw. Sess. Laws Act 276, § 2
at 610.

 3. In 2001, the Legislature amended HRS § 87-22.3 to
delete the provision in that section which gave the Board
discretion to use rate credits or reimbursements derived from
employee-beneficiary premium payments, or interest derived
therefrom, to improve Health Fund plans or reduce employee-
beneficiary premiums.  HRS § 87-22.3 (Supp. 2001); 2001 Haw.
Sess. Laws Act 147, § 2 at 359.

C.

 Beginning in 1992, the Health Fund began accumulating a
significant surplus in premium overpayments.  In 1993, the Health
Fund and HMSA entered into a two-year medical plan agreement
which provided that the premium surplus of $8 million from a
prior contract would be kept in a rate stabilization reserve and
used to offset any deficit in premiums HMSA might incur.  Under
the experience-rated method used in HMSA's contract with the
Health Fund, HMSA was responsible for covering any deficiency if
the premiums paid were less than the actual claims paid plus
HMSA's fee.  It was believed that the creation of a rate
stabilization reserve would reduce HMSA's risk of incurring a
deficiency and thereby serve to reduce the level of premiums
requested by HMSA.

 For the years 1992 and 1993, a surplus of approximately
$17 million was accumulated, with $8 million held in the rate
stabilization reserve.  The Health Fund asked stakeholders to
comment on various alternatives for the surplus, including adding
to the rate stabilization reserve, waiving employer and employee
premiums for one month, refunding premiums to employers and
employees, purchasing additional benefits, and upgrading
computers.  HGEA objected to using the surplus for refunds in

that it would likely cause "turmoil, acrimony and possible income tax liabilities for [HGEA employees]."  After the 1994 plan year, the surplus had grown to approximately $30 million.  The Board decided to use the surplus for rate stabilization by increasing rate stabilization reserves and also considered self-insuring the health plans as a means of reducing costs.  There were no premium increases in the HMSA medical plan for the years 1995, 1996, and 1997.

In 1998, the Legislature mandated the return of $43 million of the accumulated surplus to State and county employers, representing the "employers' share" of the surplus.[10]  The employers' share of the surplus was calculated based on the percentage they paid of the total monthly premiums for the health plan, which was generally 60 percent under the applicable collective bargaining agreements.  The remaining portion of the surplus determined to be the "employees' share" was retained in the Health Fund.

The distribution of $43 million of the surplus to employers made self-insurance by the Health Fund no longer feasible.  Although using the surplus to improve plan benefits or reduce premiums were options, the Board expressed concern that using the surplus for these purposes may not be fair.  This is because a significant portion of the employees who had paid the excess premiums that generated the surplus were no longer participants in the applicable health plans, having retired, resigned, or enrolled in union health plans.  Thus, using the surplus to improve plan benefits or reduce premiums would have benefitted certain employees who had not generated the surplus, such as new enrollees, and would have provided no benefit to a large number of employees who had generated the surplus but were

_____

[10] A portion of the $43 million consisted of premium surpluses from health plans in which members of the Class were not enrolled, such as retiree health plans.

no longer enrolled in the applicable plans.[11] The Board decided to invest the surplus and seek legislative authorization to make refunds to employees who had paid the excess premiums.

In 2001, the Legislature amended HRS § 87-3(a) to authorize the Health Fund to return premium surpluses to "identifiable employee-beneficiaries who participated in ascertainable years to create the rate credit or reimbursement[.]" HRS § 87-3(a) (Supp. 2001); 2001 Haw. Sess. Laws Act 147, § 1 at 359. In June-July 2002, the Health Fund made refunds of $23,153,428 to such employees, which was determined to be the employees' share of the accumulated premium surplus. After its termination, the Health Fund transferred premium surpluses it held to the EUTF. In 2005, the EUTF refunded $5,228,694 to employees, as the employees share of the premium surpluses.

II.

On June 30, 2003, Plaintiffs filed a complaint against the Health Fund, the Board, the Trustees, the Director of Finance, the EUTF, HMSA, HMO Hawaii, Hawaii Dental Service (HDS), Vision Service Plan (VSP), and the State. The complaint stated ten causes of action:

1.    Count I -- Declaratory Judgment and Accounting, which sought to compel an accounting of Health Fund transactions from 1961 to 2003 and to obtain a declaratory judgment regarding the refunds, rate credits, and other returns and reimbursements owed to the Class.

2.    Count II -- Damages for Over-Charging, which sought damages for overcharging the Class for health insurance.

3.    Count III -- Damages for Misrepresentation, which sought damages for failing to inform the Class that premiums might be refunded by health insurance carriers under the experience-rated plans.

_____

[11] For example, Defendants assert that during the period 1992 to 1995, when most of the premium surpluses were generated, more than 17,000 employees had terminated their enrollment in Health Fund plans.

4.     Count IV -- Damages for Breach of Contract, which sought damages for the Health Fund's using the premium surpluses for purposes other than to improve health plan benefits or reduce employee contributions.

5.     Count V -- Unconstitutional Taking/Impairment, which sought a declaration that laws directing that the premium surpluses be returned to employers are unconstitutional.

6.     Count VI -- Improper Expenditure of Funds, which sought damages for amounts the Health Fund spent from surpluses for the EUTF's benefit.

7.     Count VII -- Enjoin Turnover of Funds to EUTF, which sought to enjoin the Health Fund from turning over funds to the EUTF.

8.     Count VIII -- Enjoin Carrier Payments to EUTF, which sought to enjoin Health Fund carriers from turning over rate credits, refunds, or other amounts to the EUTF.

9.     Count IX -- Breach of Fiduciary Duties, which sought damages for the breach of fiduciary duties by the Health Fund, Board, and the State.

10.    Count X -- Constructive Trust, which sought to impose a constructive trust on any defendant holding property which constitutes, or was derived from, rate credits, refunds, reimbursements, or other amounts belonging to the Class.

The Circuit Court granted Plaintiff's motion for class certification and certified the Class as

> all employee-beneficiaries, as that term is defined in HRS § 87-1 (but excluding State judges and attorneys employed by the office of the Attorney General) who as active employees (not as retirees) participated in, and were beneficiaries of, the [Health Fund] plans (not employee organization or "union" plans) for medical, prescription drug, vision and adult dental benefits . . . from the inception of the Health Fund to June 30, 2003.

The health plan carriers, HMSA, HMO Hawaii, HDS, and VSP, were dismissed by stipulation of the parties, thereby effectively dismissing Count VIII. The Circuit Court also dismissed the EUTF with prejudice. The remaining defendants, the Health Fund, the Board, the Trustees, the Director of Finance,

16

and the State (collectively, "Defendants"), are the Defendants-Appellees/Cross-Appellants in this appeal.

Defendants filed a motion for summary judgment on all counts in the complaint. The Circuit Court granted the motion with respect to Counts I and VI, and it denied the motion, without prejudice, as to the other counts. Defendants thereafter filed three motions for partial summary judgment: (1) "First Motion for Partial Summary Judgment on Statutory Construction Issues (Counts V and VII of the Complaint)" (First Motion for Partial Summary Judgment); (2) "Second Motion for Partial Summary Judgment on Trust and Contract Law Issues (Counts II, III, IV, IX, and X of the Complaint)" (Second Motion for Partial Summary Judgment); and (3) "Third Motion for Partial Summary Judgment Dismissing the Complaint Based Upon the Statute of Limitations and Laches" (Third Motion for Partial Summary Judgment). In addition to opposing Defendants' motions for partial summary judgment, Plaintiffs filed a "Counter-Motion for Partial Summary Judgment on Breach of Contract/Statutory Violations Claims" (Counter-Motion for Partial Summary Judgment).

The Circuit Court granted Defendants' First Motion for Partial Summary Judgment and Second Motion for Partial Summary Judgment. These grants of partial summary judgment, when combined with the Circuit Court's grant of summary judgment on Counts I and VI pursuant to Defendants' original summary judgment motion, resulted in the disposition in Defendants' favor of all claims raised against Defendants in Plaintiffs' complaint. The Circuit Court denied Defendants' Third Motion for Summary Judgment and denied Plaintiffs' Counter-Motion for Partial Summary Judgment. The Circuit Court entered its Final Judgment in favor of Defendants and against Plaintiffs on all claims in Plaintiffs' complaint on October 5, 2006. Plaintiffs appeal from the Final Judgment. Defendants cross-appeal, challenging the Circuit Court's order denying their Third Motion for Partial Summary Judgment.

STANDARDS OF REVIEW

I.   Summary Judgment

"We review the circuit court's grant or denial of summary judgment *de novo*," <u>Querubin v. Thronas</u>, 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005), using the same standard applicable to the circuit court.  <u>Iddings v. Mee-Lee</u>, 82 Hawai'i 1, 5, 919 P.2d 263, 267 (1996).  Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Hawai'i Rules of Civil Procedure (HRCP) Rule 56(c) (2000).

The party moving for summary judgment has the initial burden of production as well as the ultimate burden of persuasion.  <u>French v. Hawaii Pizza Hut, Inc.</u>, 105 Hawai'i 462, 470, 99 P.3d 1046, 1054 (2004).  The moving party has the initial

> burden of producing support for its claim that: (1) no genuine issue of material fact exists with respect to the essential elements of the claim or defense which the motion seeks to establish or which the motion questions; and (2) based on the undisputed facts, it is entitled to summary judgment as a matter of law.  Only when the moving party satisfies its initial burden of production does the burden shift to the non-moving party to respond to the motion for summary judgment and demonstrate specific facts, as opposed to general allegations, that present a genuine issue worthy of trial.

<u>Id.</u> (emphasis omitted) (quoting <u>GECC Fin. Corp. v. Jaffarian</u>, 79 Hawai'i 516, 521, 904 P.2d 530, 535 (App. 1995)).

> Once the moving party has satisfied its initial burden of showing the absence of a genuine issue of material fact and its entitlement to a judgment as a matter of law, the opposing party "may not rest upon the mere allegations or denials of [the opposing party's] pleading" but must come forward, through affidavit or other evidence, with "specific facts showing that there is a genuine issue for trial." HRCP Rule 56(e).  If the opposing party fails to respond in this fashion, the moving party is entitled to summary judgment as a matter of law.  <u>Hall v. State</u>, 7 Haw. App. 274, 284, 756 P.2d 1048, 1055 (1988); <u>see also</u> HRCP 56(e).

<u>Wittig v. Allianz, A.G.</u>, 112 Hawai'i 195, 200, 145 P.3d 738, 743 (App. 2006) (brackets in original).

> A summary judgment motion challenges the very existence or legal sufficiency of the claim or defense to which it is addressed.  In effect the moving party takes the

> position that he is entitled to prevail because his opponent
> has no valid claim for relief or defense to the action, as
> the case may be.  He thus has the burden of demonstrating
> that there is no genuine issue as to any material fact
> relative to the claim or defense and he is entitled to
> judgment as a matter of law.

First Hawaiian Bank v. Weeks, 70 Haw. 392, 396, 772 P.2d 1187, 1190 (1989) (quotation marks, ellipsis points, and citations omitted).  Where the party defending the action (who does not have the burden of proof) moves for summary judgment, "[h]e may discharge his burden by demonstrating that if the case went to trial there would be no competent evidence to support a judgment for his opponent.  For if no evidence could be mustered to sustain the nonmoving party's position, a trial would be useless."  Id. at 396-97, 772 P.2d at 1190 (quotation marks, ellipsis points, brackets, and citations omitted).

"A party opposing a motion for summary judgment cannot discharge his or her burden by alleging conclusions, 'nor is [that party] entitled to a trial on the basis of a hope that [he or she] can produce some evidence at that time.'"  Henderson v. Prof'l Coatings Corp., 72 Haw. 387, 401, 819 P.2d 84, 92 (1991) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 2727 (1983)).

II.  Constitutionality of Statute

"We review questions of constitutional law de novo, under the right/wrong standard."  United Public Workers, AFSCME, Local 646, AFL-CIO v. Yogi, 101 Hawai'i 46, 49, 62 P.3d 189, 192 (2002).  "Every enactment of the [L]egislature carries a presumption of constitutionality and should be upheld by the courts unless it has been shown to be, beyond all reasonable doubt, in violation of the constitution."  City and County of Honolulu v. Ariyoshi, 67 Haw. 412, 419, 689 P.2d 757, 763 (1984).

DISCUSSION

I.

Plaintiffs argue that the Circuit Court erred in granting summary judgment on their complaint, which sought damages of "at least $43 million" from Defendants.  The portion of the premium surpluses equal to the percentage of the monthly

premiums paid by employees was distributed to members of the Class. Plaintiffs contend that they are entitled to recover as damages the premium surpluses that were distributed to employers.[12]/

A fundamental premise underlying Plaintiffs' claim for damages is that the statutory provisions regarding the permissible uses of the premium surpluses created vested property rights and contractual obligations that were binding on the State. Plaintiffs argue that the State unconstitutionally took their vested property rights and breached its contractual obligations when the Legislature passed legislation requiring the Health Fund to return amounts designated as the employers' share of premium surpluses to State and county employers. We disagree. We conclude that the statutory provisions governing the Health Fund did not create vested property rights or contractual obligations that precluded the return of the premium surpluses distributed to employers.

A.

In <u>Office of Hawaiian Affairs v. State</u>, 110 Hawai'i 338, 354, 133 P.3d 767, 783 (2006), the Hawai'i Supreme Court concluded that legislative enactments do not create contractual obligations unless the Legislature's intent to contractually bind the government is clear and unambiguous. The Hawai'i Supreme Court quoted with approval the standards applied by the United States Supreme Court for determining whether legislation creates contractual or vested rights that bind the government.

> For many decades, this Court has maintained that *absent some clear indication that the legislature intends to bind itself contractually, the presumption is that "a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise."* <u>Dodge v. Board of Education</u>, 302 U.S. 74, 79, 58 S.Ct. 98, 100, 82 L.Ed. 57 (1937). <u>See also</u> <u>Rector of Christ Church v. County of Philadelphia</u>, 24 How. 300, 302, 16 L.Ed. 602 (1861) ("Such an interpretation is not to be favored"). This

---

[12]/ Plaintiffs do not allege that Defendants failed to provide the health benefits set forth in the Health Fund plans. The premium surpluses distributed to members of the Class and to employers included interest accrued thereon.

well-established presumption is grounded in the elementary proposition that the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state. <u>Indiana ex rel. Anderson v. Brand</u>, 303 U.S. 95, 104-105, 58 S.Ct. 443, 447-448, 82 L.Ed. 685 (1938). Policies, unlike contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body. Indeed, "'[t]he continued existence of a government would be of no great value, if by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation.'" <u>Keefe v. Clark</u>, 322 U.S. 393, 397, 64 S.Ct. 1072, 1074, 88 L.Ed. 1346 (1944) (quoting <u>Charles River Bridge v. Warren Bridge</u>, 11 Pet. 420, 548, 9 L.Ed. 773 (1837)). Thus, *the party asserting the creation of a contract must overcome this well-founded presumption,* <u>Dodge</u>, <u>supra</u>, 302 U.S., at 79, 58 S.Ct., at 100, *and we proceed cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation.*

> *In determining whether a particular statute gives rise to a contractual obligation, "it is of first importance to examine the language of the statute."* <u>Dodge v. Board of Education</u>, <u>supra</u>, at 78, 58 S.Ct., at 100. <u>See also</u> <u>Indiana ex rel. Anderson v. Brand</u>, <u>supra</u>, 303 U.S., at 104, 58 S.Ct., at 447 ("Where the claim is that the State's policy embodied in a statute is to bind its instrumentalities by contract, the cardinal inquiry is as to the terms of the statute supposed to create such a contract"). "If it provides for the execution of a written contract *on behalf of the state* the case for an obligation binding upon the state is clear." 302 U.S., at 78, 58 S.Ct., at 100 (emphasis supplied). But *absent "an adequate expression of an actual intent" of the State to bind itself,* <u>Wisconsin & Michigan R. Co. v. Powers</u>, 191 U.S. 379, 386-387, 24 S.Ct. 107, 108-109, 48 L.Ed. 229 (1903), *this Court simply will not lightly construe that which is undoubtedly a scheme of public regulation to be, in addition, a private contract to which the State is a party.*

<u>Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.</u>, 470 U.S. 451, 465-67, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985) (some emphases in original, some added) (brackets in original).

<u>Office of Hawaiian Affairs</u>, 110 Hawai'i at 352-53, 133 P.3d 781-82.

The Hawai'i Supreme Court further emphasized that

> [c]ourts proceed cautiously in identifying those statutes which contractually bind the government to its terms because:

> > Finding a public contractual obligation has considerable effect. It means that a subsequent

> legislature is not free to significantly impair that
> obligation for merely rational reasons. Because of
> this constraint on subsequent legislatures, and thus
> on subsequent decisions by those who represent the
> public, there is . . . a higher burden to establish
> that a contractual obligation has been created.
>
> Parella v. Ret. Bd. of R.I. Employees' Ret. Sys., 173 F.3d
> 46, 60 (1st Cir. 1999).

Id. at 353, 133 P.3d at 782.

Here, Plaintiffs fail to overcome the well-established presumption that the Health Fund legislation was "not intended to create private contractual or vested rights," binding on the State, that entitle Plaintiffs to recover as damages the premium surpluses that were distributed to employers. See id. at 352, 133 P.3d at 781 (quoting Nat'l R.R. Passenger Corp., 470 U.S. 451, 465-66 (1985)). From the inception of the Health Fund statute until its repeal, RLH § 5A-4 and HRS § 87-4(f) provided that employer contributions to the Health Fund for health plan premiums "shall not be considered as wages or salary of an [employee-beneficiary] and no [employee-beneficiary] shall have any vested right in or be entitled to receive any part of any contribution made to the [Health Fund]." The Legislature's action in specifically providing that employees have no vested right in employer premium contributions demonstrates that the Legislature did not intend to create vested or contractual rights for employees in the premium surpluses distributed to employers.

The lack of the Legislature's "clear and unambiguous" intent to create the vested rights or contractual obligations asserted by Plaintiffs is further demonstrated by the numerous times that the Legislature changed the permissible uses for the premium surpluses through statutory amendments. During the life of the Health Fund, the Legislature repeatedly amended RLH § 5A-3 and HRS § 87-3, which set forth the permissible uses for the premium surpluses. The various and changing permissible uses for premium surpluses during the Health Funds's existence under RLH § 5A-3 and HRS § 87-3 include the following: (1) provide employee-beneficiaries and dependent-beneficiaries with a health benefits plan (1961-2003); (2) finance the State's contributions

for children's dental plans (1965-1991); (3) finance county contributions for children's dental plans (1978-1991); (4) finance employees' portion of the contributions for retiree health plans (1965-1991); (5) finance the State and county employers' and the employee's contributions to health benefit plans from which the premium surpluses were derived (1991-1995); (6) improve the benefits of the plans from which the premium surpluses were derived (1991-1995); (7) return premium surpluses derived from retiree and surviving spouse plans to the State or county for deposit into the appropriate general fund (1995); (8) return premium surpluses to the State or county for deposit into the appropriate general fund (1996); (9) use premiums surpluses to stabilize rates of health benefit plans or long-term care benefit plans (1997-2003); (10) return the portion of premium surpluses from health benefits plans financed by State or county employers (in excess of funds used to stabilize benefit plan costs) to the State or county for deposit into the appropriate general fund (1997-2003); (11) return premium surpluses from retiree and surviving spouse plans (in excess of funds used to stabilize benefit plan costs) to the State or county for deposit into the appropriate general fund (1997-2003); (12) return premium surpluses derived from employee-beneficiary contributions to health plans (in excess of funds used to stabilize benefit plan costs) to employee-beneficiaries who created the surpluses (2001-2003); and (13) use premium surpluses derived from employee-beneficiary contributions to health plans to reduce the employee-beneficiary's share of monthly premiums (2001-2003). The Legislature's repeated amendments to RLH § 5A-3 and HRS § 87-3 belie any clear and unambiguous intent by the Legislature to create vested or contractual rights regarding the permissible uses of the premium surpluses that were distributed to employers.

The premium surpluses at issue in this case began accumulating in 1992, and the bulk of the surpluses were accumulated in plan years 1992 through 1995. In support of their claim to vested and contractual rights to the premium surpluses, Plaintiffs contend that prior to 1995, the Health Fund statute

23

permitted the accumulated premium surpluses to be used *only* for the benefit of employees. The 1991 amendments to HRS § 87-3 refute this contention. The 1991 amendments authorized the Health Fund to use premium surpluses not only to finance the employee's contributions, but to finance State and county employers' contributions, to health benefit plans from which the surpluses were derived. Thus *before* the accumulation of the premium surpluses at issue in this case, the Health Fund was authorized to use premium surpluses to finance employer contributions, and it was not limited to using the accumulated surpluses solely to benefit employees.

Although the 1991 amendments were repealed in June 1995, they were in effect during the time that the bulk of the premium surpluses were accumulated. Moreover, the 1991 amendments were replaced with provisions that continued to authorize varied uses for premium surpluses that were not limited to only benefitting employees. The 1995 amendments to HRS § 87-3(a) authorized the return of premium surpluses derived from retiree and surviving spouse health plans to the State or county; the 1996 amendments authorized premium surpluses to be returned to the State or county; and the 1997 amendments authorized the portion of premium surpluses from health plans financed by State or county employers to be returned to the State or county.

In light of the Legislature's decree that employees had no vested right in employers' premium contributions and the numerous amendments to HRS § 87-3 which expanded the permissible uses of the premium surpluses to include uses benefitting employers, we conclude that the Health Fund statute did not create vested property rights or contractual obligations that precluded the return of the premium surpluses distributed to employers.[13] Plaintiffs cannot meet their burden of showing that

_____

[13] We are not persuaded by Plaintiffs' contention that the premium surpluses do not constitute "rate credits" or "reimbursements" and thus the amendments to HRS § 87-3 which expanded the authorized uses for rate credits or reimbursements do not apply to the premium surpluses. It is clear from our review of the various amendments to HRS Chapter 87, as well as our review of
(continued...)

the Legislature had a clear and unambiguous intent to create private contractual or vested rights that entitle them to recover as damages the premium surpluses that were distributed to employers. Accordingly, Defendants did not violate vested rights or breach contractual obligations in distributing the premium surpluses to employers. Based on the same reasoning, we conclude that the Legislature's enactment of legislation directing and authorizing the Health Fund to take such action did not constitute an unconstitutional taking of vested property rights or the impairment of contract.[14]/

## II.

Plaintiffs claim that the Trustees breached their fiduciary duties in operating the Health Fund. In particular, Plaintiffs contend that the Trustees breached their fiduciary duties by allowing the premium surpluses to accumulate in the Health Fund without using them to improve benefits or reduce employee premiums. Plaintiffs also claim that the Trustees engaged in misrepresentation in describing the health plans. We conclude that these claims are without merit.

In Awakuni v. Awana, 115 Hawai'i 126, 133, 165 P.3d 1027, 1034 (2007), the Hawai'i Supreme Court concluded that the

---

[13]/(...continued)
Act 141, that the Legislature intended its reference to "rate credits or reimbursements" to include premium surpluses. Indeed, Plaintiffs do not offer any reasonable explanation of what else the Legislature intended to refer to in using those terms.

[14]/ Our analysis is not affected by HRS § 87-22.3, which prior to 1997 provided that pursuant to HRS § 87-4, "[a]ny rate credit or reimbursement from any carrier of any earnings or interest derived from [Health Fund plans] . . . shall be used to improve the respective [Health Fund plans] or to reduce the employee-beneficiary's respective share of monthly contributions to a health plan." We note that the pre-1997 version of HRS § 87-22.3, by its terms, appears to be limited to "earnings or interest" applicable to rate credits or reimbursements, and it was also subject to HRS § 87-4, which provided that employee-beneficiaries had no vested right to employer premium contributions. In addition, HRS § 87-22.3 was amended in 1997 to change the phrase "shall be used" to "may be used," and the portion of the statute that referred to rate credits and reimbursements was repealed in 2001. See discussion, supra, at pages 12-13. When viewed together with HRS § 87-4 and the numerous amendments and authorized uses for premium surpluses set forth in HRS § 87-3, we conclude that HRS § 87-22.3 does not serve to clearly and unambiguously show the Legislature's intent to create private contractual or vested rights for Plaintiffs in the premium surpluses distributed to employers.

trustees of a trust created by statute are not automatically subject to all of the common law fiduciary duties. The court stated that instead of relying entirely on the common law of trusts, the court must take into consideration the specific provisions and special circumstances of the statutory trust, as expressed in the language of the statute and its legislative history, in determining how to review the trustees' decisions. Id. at 134, 165 P.2d at 1035.

In Awakuni, the court considered the duties owed by the trustees of the EUTF, the fund that succeeded the Health Fund. The court stated:

> Although HRS chapter 87A utilizes general trust terminology, it is clear that the EUTF is not a typical common law trust such that the [EUTF t]rustees are subject to all of the common law fiduciary duties. For example, under the common law, a trustee owes a duty of loyalty to the beneficiaries, i.e., to administer the trust solely in the interest of the beneficiaries. See Restatement (Third) of Trusts: Prudent Investor Rule § 170(1) ("The trustee is under a duty to administer the trust solely in the interest of the beneficiaries."). In the case of the EUTF, however, the design and establishment of health benefits plans is not to be done solely in the interests of the employee-beneficiaries. Rather, according to HRS § 87A-5 and-15, supra notes 2 & 4, half of the EUTF trustees represent the public employers, and the health benefits plans are to be provided at a cost affordable to both the public employers and the public employees. Further, the legislative history of chapter 87A states that one of the main purposes of creating the EUTF was to establish a single health benefits delivery system to make the cost of insurance affordable for the State. Conf. Comm. Rep. No. 124, in 2001 House Journal, at 1097-98. Thus, HRS chapter 87A's use of general trust language does not impose upon the EUTF [t]rustees all of the common law fiduciary duties.

Id. at 133, 165 P.3d at 1034.

Similarly, the statutory creation and evolution of the Health Fund indicate that its purpose was not limited to benefitting employee-beneficiaries, but also included providing health benefits at costs affordable to the State. Our assessment of the Trustees' duties and decisions must include consideration of the specific provisions and special circumstances of the Health Fund.

Plaintiffs argue that the Trustees breached their fiduciary duties by allowing the premium surpluses to accumulate instead of using them to improve benefits or reduce the

employees' share of the monthly contribution. Plaintiffs apparently reason that if premium surpluses had been used more expeditiously, i.e., before 1998, then there would have been no surplus for the Legislature to "take" and return to employers.

The Health Fund statute, however, did not prohibit the Trustees from accumulating premium surpluses or require them to use the premium surpluses within a particular period of time. It did not preclude the Trustees from maintaining the premium surpluses while they considered their options on how to best use the surpluses. Instead, the Health Fund statute gave the Board broad power to administer the Health Fund and carry out its purposes. See RLH 5A-12; HRS § 87-21 (1993); see also Awakuni, 115 Hawai'i at 134-35, 165 P.3d at 1035-36 (concluding that although the EUTF statute does not use the word "discretion" in requiring the EUTF board of trustees to determine the structure of the health benefits plan, the Legislature clearly intended that the board have broad discretion in such decisions). We conclude that the Trustees acted reasonably and did not abuse their discretion in deciding to permit the premium surplus to accumulate.

As noted, the premium levels were set before the beginning of the plan year, and they were based on estimates of the actual costs of providing the health benefits.[15] Thus, whether there would be a surplus or deficiency generated during a particular year could only be determined after the plan year ended. A significant portion of premium surpluses at issued in this case was accumulated in a two-year period during the 1993 and 1994 plan years. The Trustees considered several options for dealing with the surpluses, including using reserves to stabilize premium rates and accumulating sufficient surpluses to make self-insurance feasible. The Trustees were also concerned that using

---

[15] The Health Fund negotiated premium levels with health insurance carriers with the assistance of consultants, and the record reflects that HMSA was the only carrier to submit a bid proposal for the service or indemnity medical plan for certain plan years in which the premium surpluses were accumulating.

the accumulated surplus to improve plan benefits or reduce the employee's share of monthly premiums would not be fair because it would benefit certain employees who had not generated the surplus and fail to benefit many who had.

The Trustees chose to use the premium surpluses to establish rate stabilization reserves to stabilize premium rates, and there were no premium increases in the HMSA medical plan for the years 1995, 1996, and 1997. To the extent that the rate stabilization reserves served to avoid premium increases, the use of the surpluses to establish such reserves benefitted employees. In addition, the Trustees decided to keep the surplus intact while they evaluated the feasibility of self-insurance, and they sought authorization to make refunds to employees who had generated the surplus. We conclude that there was no genuine issue of material fact that the Trustees' actions were reasonable and did not constitute an abuse of discretion or a breach of fiduciary duties owed to Plaintiffs. The Circuit Court properly granted summary judgment on Plaintiffs' claims of breach of fiduciary duty. See Awakuni, 115 Hawai'i at 136, 165 P.3d at 1037 (upholding grant of summary judgment on claims that EUTF trustees breached their fiduciary duties in administering the EUTF).

We also reject Plaintiffs' claim that the Trustees engaged in misrepresentation by failing to disclose in the open enrollment booklet the possibility of a premium surplus and how that surplus would be used by the Health Fund. Whether a premium surplus would result in any given plan year was speculative, and how any premium surplus would actually be used was uncertain. In addition, Plaintiffs did not offer any evidence that their choice of a health plan would have been different had the alleged "missing" information been disclosed. We conclude that the Circuit Court properly granted summary judgment on Plaintiffs' misrepresentation claim.

III.

Defendants cross-appeal, arguing that the Circuit Court erred in denying their Third Motion for Partial Summary Judgment,

28

which sought summary judgment on certain of Plaintiffs' claims on the ground that such claims were barred by the statute of limitations and laches.  In light of our resolution of Plaintiffs' appeal, we need not decide Defendants' cross-appeal.

CONCLUSION

For the foregoing reasons, we affirm the Final Judgment entered by the Circuit Court.


DATED:   Honolulu, Hawai'i, November 23, 2011.


On the briefs:

Paul A. Schraff
(Dwyer Schraff Meyer
Grant & Green)
Charles K. Y. Khim
for Plaintiffs-Appellants/
Cross-Appellees

John P. Dellera
Deputy Attorney General
for Defendants-Appellees/
Cross-Appellants

*Craig H. Nakamura*
Chief Judge

Associate Judge

Acting Associate Judge

29